## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SUNERGY SOLUTIONS LLC, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **24-12593-BEM** |
| ) | |
| **KEVIN UNDERRINER, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION TO DISMISS

**MURPHY, J.**

Defendants Quinn Allen and QKM Consulting, Inc. ("QKM") (collectively, "Defendants")[1] have moved to dismiss the claims made against them by Plaintiffs Sunergy Solutions LLC and Sunergy Solutions, Inc. (collectively, "Sunergy") in the First Amended Complaint, Dkt. 7 ("Complaint" or "Compl."). Dkt. 18.

For the reasons stated herein, the Court ALLOWS the motion to dismiss the racketeering claim (Count VI) as to QKM. Otherwise, the motion is DENIED.

## I.    Relevant Background

The Court draws the following facts from the Complaint and accepts them as true for purposes of the instant motion.

Sunergy sells and installs residential solar panel systems throughout the Northeast, including in Massachusetts. Compl. ¶ 15. One method by which Sunergy acquires new business

---

[1] The Complaint names a third defendant, Kevin Underriner, who has since defaulted and not otherwise appeared in the case. *See* Dkts. 1, 16, 22–23. Unless otherwise clarified, the collective "Defendants" refers only to the two defendants, Allen and QKM, who together have brought this motion.

is through "leads," purchased from other companies, identifying potential customers. *Id.* ¶ 26. Sunergy stores the leads it purchases in a customer relationship management system operated by Sunbasedata, LLC ("Sunbase"). *Id.* Sunergy employees are given unique IDs and passwords to access Sunergy's leads through its Sunbase account. *Id.* ¶¶ 28, 41, 48–49, 51. Prior to December 7, 2023, Defendant Kevin Underriner was responsible for setting up those employee IDs and passwords as part of his position as a Sunergy employee. *Id.* ¶¶ 41–42.

At some point between July 2024 and September 7, 2024, Sunergy discovered that its leads were being exported without authorization "en masse" from its Sunbase account. *Id.* ¶¶ 31, 33, 47. Sunergy traced these unauthorized exports to the ID of a single employee, identified in the Complaint as "JL." *Id.* ¶¶ 48–49. JL convincingly denied downloading the suspect leads and, upon forensic examination, appeared genuinely unconnected with the improper downloads. *Id.* ¶¶ 50, 55. Rather, Sunergy was able to trace at least a portion of the exported leads to another Sunbase account, belonging to QKM. *Id.* ¶ 48.

QKM, like Sunergy, sells and installs residential solar panel systems throughout the Northeast, including in Massachusetts. *Id.* ¶¶ 18, 20, 22. QKM is also Underriner's new employer. *Id.* ¶ 44. The crux of Sunergy's allegations is that Underriner used his knowledge of Sunergy employee IDs and passwords to steal Sunergy's leads for the benefit of himself, QKM, and Defendant Allen, QKM's sole officer.[2] *Id.* ¶¶ 5, 43.

Sunergy further alleges that QKM acted upon those stolen leads, resulting in direct competition between QKM and Sunergy in at least several specific instances. *Id.* ¶¶ 58–59. Sunergy alleges that QKM has been able to offer lower prices to its customers because, in addition

---

[2] Allen apparently also used to work for Sunergy, as an independent contractor. Compl. ¶¶ 46, 69.

to the savings from not having to pay for its own leads, QKM has been using Sunergy's proprietary contract forms to execute deals with its customers.  *Id.* ¶¶ 25, 60–64.

By September 7, 2024, all of Sunergy's leads had been exported from its Sunbase account. *Id.* ¶ 58.  On October 9, 2024, Sunergy filed this lawsuit against QKM, Allen, Underriner, and other unnamed individuals.  Dkt. 1.  Sunergy makes claims for conversion, unlawful restraint of trade under several states' anti-trust or unfair business practices statutes, and for racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Compl. ¶¶ 72–102.

## II.    **Pending Motions**

On February 4, 2025, Defendants moved to dismiss the action for lack of subject matter and personal jurisdiction, under Federal Rules 12(b)(1) and 12(b)(2), and to dismiss the racketeering count for failure to state a claim, under Rule 12(b)(6).  Dkt. 18.

The parties were able to resolve the question of subject matter jurisdiction at oral argument. Sunergy confirmed that Sunergy Solutions LLC has a single member, co-Plaintiff Sunergy Solutions Inc., which is a Massachusetts corporation with a Massachusetts principal place of business.  *See also* Dkt. 32.  Defendants agreed that, accepting those facts as true, the parties are completely diverse.[3]  *See Disaster Sols., LLC v. City of Santa Isabel, Puerto Rico*, 21 F.4th 1, 5 (1st Cir. 2021) ("[L]imited liability companies are citizens of every state of which any of its members is a citizen.").[4]  Accordingly, to the extent it is not withdrawn, the Court DENIES that part of the motion and considers only the remaining grounds.

---

[3] The amount-in-controversy requirement is also clearly met.  *See* 18 U.S.C. § 1332; Compl. ¶¶ 56, 60, 62.

[4] Defendants are citizens of Maine and New Hampshire.  Dkt. 19 at 7.

III.    **Personal Jurisdiction**

Defendants argue that each lacks sufficient contacts to constitutionally justify specific jurisdiction.[5]  Dkt. 19 at 11–15.  Finding otherwise, the Court DENIES the motion as under Rule 12(b)(2).

A.    **Legal Standard**

1.    **In General**

"When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination."  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).  "That approach asks only whether the plaintiff has proffered facts that, if credited, would support all facts essential to personal jurisdiction."  *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121 (1st Cir. 2022) (internal quotes and parentheses omitted).  To meet its burden, "the plaintiff may plead sufficient jurisdictional facts in its complaint, may rely on jurisdictional facts documented in supplemental filings (such as affidavits) contained in the record, and/or may point to undisputed facts."  *Id.* at 123 (internal quotes and parentheses omitted).  At the motion to dismiss stage, the Court must "draw all reasonable inferences from [the alleged, jurisdictional facts] in [Sunergy's] favor."  *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

"Questions of specific jurisdiction are always tied to the particular claims asserted."  *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999).  Moreover, "the [specific] personal jurisdiction inquiry in federal question cases . . . differs from the inquiry in diversity cases," *Swiss Am.*, 274 F.3d at 618, thus requiring distinct analyses.

---

[5] Sunergy has not argued that either defendant is subject to general jurisdiction in Massachusetts.  *See* Dkt. 26 at 4–5 (advocating for a "minimum contacts analysis"); *see also* Dkt. 19 at 10–11.  The Court thus limits its analysis.  *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 35 (1st Cir. 2016).

2.     **Diversity Jurisdiction**

For claims over which the Court has diversity jurisdiction, "a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014). The Fourteenth Amendment requires that a plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (internal quotes omitted). Moreover, a defendant must be found to have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Finally, the exercise of jurisdiction must be "reasonable." *Id.* at 357 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). These limitations reflect "two sets of values—treating defendants fairly and protecting 'interstate federalism.'" *Id.* at 360 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)). "The plaintiff must demonstrate that each of these three requirements is satisfied." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008).

The relatedness inquiry probes the connection between a defendant's contacts with the forum and the plaintiff's claims. Relatedness is satisfied where a defendant's in-state contacts are "sufficiently related" to the claims, such to "justify subjecting a defendant to personal jurisdiction there." *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 2024 WL 3696388, at *11 (D. Mass. Aug. 7, 2024) (citing *Ford Motor*, 592 U.S. at 362). Notably, the Fourteenth Amendment does not require a "strict causal relationship between the defendant's in-state activity and the litigation." *Ford Motor*, 592 U.S. at 362.[6]

---

[6] In *Ford Motor*, the Supreme Court rejected the idea that personal jurisdiction required "proof that the plaintiff's claim came about because of the defendant's in-state conduct." 592 U.S. at 362. In concurrence, Justice Alito characterized the sufficient facts alternatively as "causal in a broad sense of the concept" but nevertheless agreed that the Court "properly rejected" a "but-for" causation requirement. *Id.* at 373–74 (Alito, J., concurring).

The purposeful availment inquiry considers the intentionality of those forum contacts, "ask[ing] whether a defendant has deliberately targeted its behavior toward the society or economy of a particular forum such that the forum should have the power to subject the defendant to judgment regarding that behavior." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 36 (1st Cir. 2016) (internal quotes, citations, and parentheses omitted). This requirement guards against courts' asserting jurisdiction based on "random, isolated or fortuitous contacts" or "the unilateral activity of another party." *Id.*

"To evaluate the reasonableness requirement, the Supreme Court has provided a set of 'gestalt factors' to consider." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 10 (1st Cir. 2009) (quoting *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 26 (1st Cir. 2005)). "These factors include: the defendant's burden of appearing, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and the shared interest of the several States in furthering fundamental substantive social policies." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

### 3.    <u>Federal Question</u>

Where the Court's subject matter jurisdiction is based on the presence of federal questions, specific jurisdiction requires satisfaction of a federal statute or rule authorizing service of process and comportment with the Due Process Clause of the Fifth Amendment. *Swiss Am.*, 274 F.3d at 618. "[U]nder the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." *Id.*; *see also Sec. & Exch. Comm'n v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024).

"In the mine-run of federal question cases, Federal Rule of Civil Procedure 4(k)(1) erects the framework for establishing personal jurisdiction by service of process. Under this framework,

personal jurisdiction may derive either from a state long-arm statute that sets the boundaries of a state court's jurisdictional reach or from a federal statute permitting nationwide personal jurisdiction by service of process." *Motus*, 23 F.4th at 121–22.

**B.    Analysis**

**1.    State-Law Claims**

Defendants have waived argument regarding the Massachusetts long-arm statute. Dkt. 19 at 7 n.2.  Accordingly, the Court limits its analysis to comportment with the Due Process Clause of the Fourteenth Amendment.   *Motus*, 23 F.4th at 122 ("If a defendant limits its jurisdictional objection to either statutory grounds or constitutional grounds, the court need only consider those particular grounds.").

**a.    QKM**

Sunergy has alleged sufficient QKM Massachusetts contacts to constitutionally justify specific jurisdiction with respect to the state-law claims.

Beginning with the conversion claim, the allegations in Sunergy's Amended Complaint relevant to the Court's analysis are that QKM is registered to do business in Massachusetts, Compl. ¶ 24, and advertises to its residents there, *id.* ¶¶ 18, 80; that a former-Sunergy, current-QKM employee accessed Sunergy's client-management system without authorization to download valuable business leads, *id.* ¶¶ 41–44; that those leads identified potential customers "throughout the Northeast, including . . . [in] Massachusetts," *id.* ¶¶ 32, 57; and that QKM uploaded at least a portion of those leads onto its client-management system, *id.* ¶ 34.  In an affidavit accompanying its opposition to Defendants' motion to dismiss,[7] Sunergy connects a few

---

[7] Defendants object to Sunergy's affidavit and exhibit as "inadmissible hearsay."  Dkt. 31 at 2 (citing Fed. R. Evid. 803(6)(D)).  But the rule against hearsay "applies to the admissibility of evidence, not the sufficiency of pleadings.  It therefore does not serve as a basis to challenge [pleadings] under a Rule 12 motion." *Peek v. Nationstar*

additional dots:  roughly 30% of the allegedly stolen leads added to QKM's client-management system targeted Massachusetts customers, Dkt. 26-1 ¶¶ 4–5; and several of those leads turned into sales appointments in Massachusetts with Massachusetts customers, *id.* ¶ 7.[8]

These facts satisfy the relatedness prong for the conversion claim.  Simply, the alleged conversions arise from and relate to QKM's solar business in Massachusetts, without which basis, there would have been no reason to commit the alleged conversions.  By fostering a business in the Commonwealth—advertising to its citizens, servicing those contracts—QKM set the table and "ma[de] it easier," *Ford Motor*, 592 U.S. at 365, for this injury to occur.  *See also Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) ("When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result.").[9]  Here, QKM sought to do business in Massachusetts.  According to Sunergy, those efforts led to a tortious result.  That "common-sense relationship between [Sunergy's] activities and [this] suit[]" is sufficient.  *See Ford Motor*, 592 U.S. at 374 (Alito, J., concurring).

For similar reasons, these facts satisfy the purposeful availment prong.  QKM was not dragged into Massachusetts by happenstance or "the unilateral activity of another party."  *See*

---

*Mortg., LLC*, 2017 WL 7039179, at *1 (D.N.H. Sept. 22, 2017).  At this stage, Sunergy need only "proffer" the necessary jurisdictional facts, not prove them.  *Motus*, 23 F.4th at 123.

[8] To be clear, the Court does not necessarily treat each of these as a jurisdictional "contact," per se.  Rather, some of these facts go toward demonstrating the intentionality of QKM's actions and the reasonableness of jurisdiction.

[9] In *Nowak*, the First Circuit affirmed a finding of personal jurisdiction against a Hong Kong hotel based on the hotel's having solicited Massachusetts customers.  94 F.3d at 712–16.  The court agreed that the solicitations "set in motion a chain of reasonably foreseeable events" that resulted in a guest's drowning in the hotel's pool.  *Id.* at 716 (quoting *Nowak v. Tak How Inv. Ltd.*, 899 F. Supp. 25, 32 (D. Mass. 1995)).  It would be paradoxical to find that the indirect inducement of third parties (to book a room and then use the hotel pool) is reasonably foreseeable but that a "chain" of events made up entirely of one's own actions is too murky to imagine.

*Baskin-Robbins*, 825 F.3d at 28.  Rather, QKM "deliberately targeted," *id.*, the Massachusetts economy, Compl. ¶¶ 18, 24, 80, making it reasonably foreseeable that QKM would be subject to the power of Massachusetts courts to account for any tortious activity arising therefrom.

Finally, considering the "gestalt" factors on balance, *see Astro-Med*, 591 F.3d at 10, the Court finds this exercise of jurisdiction reasonable.  Although QKM states that it "has no physical presence in Massachusetts, and no employees or agents based there," Dkt. 19 at 14, Sunergy has proffered facts suggesting a significant QKM physical presence in Massachusetts.  *See, e.g.*, Compl. ¶¶ 18, 62 (alleging that QKM sells and installs residential solar systems in Massachusetts, including at least one specific example); Dkt. 26-1 at 6–16 ("Ex. A") (identifying numerous "In Person" QKM appointments in Massachusetts).  At this stage, the Court must credit Sunergy's version of the facts.  *Motus*, 23 F.4th at 123.

Sunergy's argument regarding the location of witnesses and the associated burden does carry some weight.  *See* Dkt. 19 at 15.  However, that objection ultimately "rings hollow" upon consideration of Sunergy's claim under Massachusetts General Law ch. 93A.  *See Astro-Med*, 591 F.3d at 11.  It is certainly reasonable to bring *that* claim in Massachusetts—it necessarily encompasses a broader scope of Massachusetts contacts, including alleged in-state uses of the business leads.  *See, e.g.*, Compl. ¶ 62.  Given that the relevant witnesses must come to Massachusetts for that trial, the only inefficient alternative would be to have two separate cases in two separate jurisdictions.

Finally, the Court notes that this is not a case where the forum state has "little legitimate interest" in the claims.  *See Ford Motor*, 592 U.S. at 372 (Alito, J., concurring) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 256 (2017)).  The allegations are that QKM stole information about Massachusetts residents from a

Massachusetts corporation to support QKM's business efforts in Massachusetts. "Can anyone seriously argue that requiring [QKM] to litigate [this] case[] in [Massachusetts] would be fundamentally unfair?" *Id.*

Accordingly, QKM's motion to dismiss for lack of personal jurisdiction is DENIED as to the conversion claim.

The Court would standardly perform further, separate analyses for each of the state-law claims. *See Phillips Exeter*, 196 F.3d at 289. However, the facts of the conversion claim necessarily fold into each of those other counts. *See* Compl. ¶¶ 91, 94–95, 98–99, 102–03 (basing liability on "converted" or "stolen" leads). It therefore follows that the motion is also DENIED as to the other state-law claims.

### b.     <u>Allen</u>

QKM's jurisdictional contacts, properly imputed to Allen, constitutionally justify specific personal jurisdiction.

Although Defendants are correct that Sunergy's Complaint is largely "silent about Allen's contacts with Massachusetts," Dkt. 19 at 14 n.7, Allen is QKM's "sole Officer and Director," Compl. ¶ 5. Indeed, Defendants confirm that Allen is QKM's "owner and sole officer." Dkt. 19 at 7.[10]

Where an individual is shown to assert total or near-total control over a corporation, its contacts may be imputed for jurisdictional purposes.[11] Indeed, courts "have disregarded the corporate form [for jurisdictional purposes] when an individual defendant '. . . was the alter ego

---

[10] At oral argument, Defendants further stated that Allen was QKM's sole employee.

[11] This is notwithstanding the "general rule" "that jurisdiction over the individual officers of a corporation may not be based merely on jurisdiction over the corporation." *Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 573 F. Supp. 1106, 1111 (D. Mass. 1983), *aff'd*, 743 F.2d 947 (1st Cir. 1984).

of the corporation or . . . had an identity of interest with the corporation itself (i.e., the corporation and the corporation's president).'" *M-R Logistics, LLC v. Riverside Rail, LLC*, 537 F. Supp. 2d 269, 280 (D. Mass. 2008) (quoting *LaVallee v. Parrot-Ice Drink Prods. of Am., Inc.*, 193 F. Supp. 2d 296, 301 (D. Mass. 2002) (citing cases)); *cf. Malden Transportation, Inc. v. Uber Techs., Inc.*, 286 F. Supp. 3d 264, 271–72 (D. Mass. 2017) (finding imputation improper where no facts supported idea that individual defendants had pervasive control over corporation).[12]

The facts here support the reasonable inference that there is an "identity of interest," *M-R Logistics*, 537 F. Supp. at 280, between Allen and QKM, such that imputing QKM's jurisdictional contacts comports with Due Process.[13]

Accordingly, Allen's motion to dismiss for lack of personal jurisdiction is DENIED as to the conversion claim. As shown above, it therefore follows that the motion is also DENIED as to the other state-law claims.

---

[12] Notably, this is distinct from courts' piercing the corporate veil for liability purposes. *See generally* King Fung Tsang, *The Elephant in the Room: An Empirical Study of Piercing the Corporate Veil in the Jurisdictional Context*, 12 HASTINGS BUS. L.J. 185 (2016). Most clearly, the relevant sources of law are different—liability piercing for state-law claims is governed by state law, *see, e.g.*, *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 356 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013), whereas the issue here is constitutional, *see Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 56–57 (1st Cir. 2002). More importantly, the considerations are different. Under Massachusetts law, piercing the corporate veil is an equitable remedy employable "in rare particular situations in order to prevent gross inequity." *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968). By contrast, the baseline question for jurisdictional imputation is simply one of fairness to defendants under the Due Process Clause. *See Daynard*, 290 F.3d at 56–57 ("Even if the defendants' relationship were to fall slightly outside of the confines of these specific [state-law] doctrines, the question before us is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction.").

[13] Further, as shown in the following section, Allen is subject to personal jurisdiction for the closely related racketeering claim. *See* pp. 12–14, *infra*. Under the doctrine of pendent personal jurisdiction, the Court could (and would) alternatively assert personal jurisdiction over Allen for the state-law claims on that basis. *See Nahigian v. Leonard*, 233 F. Supp. 2d 151, 159 (D. Mass. 2002); *Kovanda v. Heitman LLC*, 2024 WL 3888762, at *9 (D. Mass. Aug. 16, 2024) (citing cases recognizing the common practice).

### 2.    Federal Racketeering Claim

Sunergy may rely on RICO's nationwide service provision to establish personal jurisdiction over both Allen and QKM for the racketeering claim.[14]  This exercise of personal jurisdiction comports with the Due Process Clause of the Fifth Amendment.  Accordingly, the Court has personal jurisdiction over both Allen and QKM for the racketeering claim.[15]

### a.    RICO Nationwide Service of Process

Defendants ask the Court to apply "the majority rule that RICO's [nationwide service] provision . . . provide[s] a basis for the exercise of personal jurisdiction" only where there is "a showing that the Due Process Clause [of the Fourteenth Amendment] is satisfied with respect to at least one defendant."  Dkt. 19 at 10 n.4. (citing *World Depot Corp. v. Onofri*, 2017 WL 6003052, at *5 (D. Mass. Dec. 4, 2017) and *Ginsburg v. Dinicola*, 2007 WL 1673533, at *4–5 (D. Mass. June 7, 2007)).

RICO's nationwide service provision is the subject of tortured controversy.  Courts, including district courts within this Circuit, have disagreed about which section of the statute governs.  *Naicom Corp. v. DISH Network Corp.*, 2024 WL 1363755, at *19–20 (D.P.R.

---

[14] Defendants have never disputed that Sunergy's claim under RICO confers federal question jurisdiction. *See* Dkt. 19 at 19.  Rather, Defendants' argument—now moot considering the Court's diversity jurisdiction—was that the Court should decline supplemental jurisdiction if it dismissed that count.  *Id.*

[15] As stated above, Defendants waived argument regarding the long-arm statute, explicitly opting to rely exclusively on "the Constitutional standard."  Dkt. 19 at 7 n.2.  As to the state-law claims, for which the Court has diversity jurisdiction, the long-arm and constitutional standards are largely comparable, *see Baskin-Robbins*, 825 F.3d at 34, if not entirely coextensive, *see Mojtabai v. Mojtabai*, 4 F.4th 77, 85 (1st Cir. 2021).  As to the federal racketeering claim, for which the Court has federal question jurisdiction, however, the two standards are markedly different.  *See Swiss Am.*, 274 F.3d at 618 (explaining that "in federal question cases . . . the constitutional limits of the court's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment" requiring only "adequate contacts with the United States as a whole, rather than with a particular state" (internal citation and quotes omitted)).  Arguably, Defendants have waived any personal jurisdiction argument as to the federal claim outside satisfaction of "the Constitutional standard," Dkt. 19 at 7 n.2, as fixed by the Fifth Amendment.  *See Swiss Am.*, 274 F.3d at 618; *Motus*, 23 F.4th at 122.  Nevertheless, the Court addresses the (federal) statutory basis for personal jurisdiction as to that claim.

Mar. 29, 2024) (citing cases). Even courts that agree on what language applies may disagree about how to interpret that language. *Id.* at *20 (discussing the "ends of justice" requirement).

The Court need not weigh in on this debate because Sunergy's allegations satisfy Defendants' proposed reading of the statute. As shown in the previous section, QKM's Massachusetts contacts satisfy the Fourteenth Amendment, as do Allen's by extension. *See* pp. 7–11, *supra*. The same facts underlie the racketeering claim. *See* Compl. ¶¶ 107–11. Therefore, applying Defendants' proposed reading of the statute, RICO provides a statutory basis for personal jurisdiction.[16]

### b.     The Fifth Amendment

There can be little question that Sunergy has alleged, for each defendant, sufficient relevant contacts with the United States "as a whole," *Swiss Am.*, 274 F.3d at 618, to justify jurisdiction under the Due Process Clause of the Fifth Amendment. Allen is a U.S. (Maine) resident who therefrom operates QKM, a U.S. (Maine) corporation, as its "owner and sole officer." Compl. ¶¶ 5, 9–10; Dkt. 19 at 7. *See Nahigian v. Leonard*, 233 F. Supp. 2d 151, 158 (D. Mass. 2002) (finding minimum contacts met by U.S. residency alone). Under these circumstances, the Court also finds such exercise of jurisdiction reasonable. *See Swiss Am.*, 191 F.3d at 36.

---

[16] In a footnote, Defendants ask the Court to apply an additional rule, further limiting Sunergy's ability to rely on the RICO statute's nationwide service provision, based on an (in all fairness, correct) presumption as to the results of their merits-based challenge under Rule 12(b)(6). Dkt. 19 at 19 n.9 ("If the RICO count is dismissed as to QKM, Sunergy cannot rely on QKM's contacts with Massachusetts to manufacture . . . jurisdiction as to any other defendant."). This issue is somewhat mooted by the Court's finding that personal jurisdiction over Allen, himself, is proper under the Fourteenth Amendment. *See* pp. 10–11, *supra*. Nevertheless, even if the Court were to base Allen's RICO service of process on QKM's contacts (as such, rather than by imputation), the Court sees no reason (and counsel offers none) why it would depart from its normal "jurisdiction-before-merits" order of operation. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 575 (1999); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 118 (1998)); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 941–42 (11th Cir. 1997) ("[I]nsofar as an asserted federal claim is not wholly immaterial or insubstantial, a plaintiff is entitled to take advantage of the federal statute's nationwide service of process provision." (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1055–57 (2d Cir. 1993), *cert. denied*, 513 U.S. 822 (1994))); *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1004 (E.D. Va. 2021) (holding same in RICO context).

Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction is DENIED as to both Defendants Allen and QKM for the racketeering claim.

## IV.    Failure to State a Claim

Defendants next argue that Sunergy has failed to state a claim for racketeering under RICO. Dkt. 19 at 15–19.  For the reasons stated below, the Court ALLOWS the Rule 12(b)(6) motion as to QKM but DENIES the motion as to Allen.

### A.    Legal Standard

Courts analyzing claims under Federal Rule 12(b)(6) must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal cites and quotations omitted).  "[A] complaint need not pin plaintiff's claim for relief to a precise legal theory.  Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  Indeed, on a motion to dismiss, the Court has an independent duty to analyze the facts as presented in the complaint to determine their sufficiency.  *Pomerleau v. W. Springfield Pub. Sch.*, 362 F.3d 143, 145 (1st Cir. 2004).

### B.    Analysis

To state a claim under RICO, a plaintiff must allege both an "enterprise" and "a pattern of racketeering activity." 18 U.S.C. § 1962(c).[17]  Defendants argue that Sunergy has failed to identify

---

[17] There is threshold lack of clarity concerning Sunergy's precise cause of action.  The Complaint alleges violations of "Title 18 U.S.C. §1962(a) through (d)." Compl. ¶ 106.  But each of those subsections is a distinct cause of action. *See Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1251 (7th Cir. 1989).  Insofar as such shotgun pleading fails to clearly notify Defendants of the claims brought against them, that alone might provide grounds for dismissal.

a proper RICO "enterprise," apart from QKM, Dkt. 19 at 18–19; that Sunergy's allegations do not constitute "racketeering activity" as determined by the statute, *id.* at 16–17; and that Sunergy has not alleged any "pattern" of such acts, *id.* at 17–18.

### 1.    Enterprise

Defendants are correct that QKM cannot be both Sunergy's "enterprise" and a defendant for purposes of a racketeering claim asserted under RICO. The text of 18 U.S.C. § 1962(c) distinguishes between the liable "person" and the underlying "enterprise" with which that liable person is "associated" or by which it is "employed." *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The enterprise cannot just be "the same 'person' referred to by a different name." *Id.* Accordingly, "[i]f the plaintiff chooses to identify the corporation as the enterprise through which its employees, as persons, conducted the RICO activity, the corporation is insulated from liability." *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 173 (D. Mass. 2003) (quoting *Rodriguez v. Banco Central*, 777 F. Supp. 1043, 1054 (D.P.R. 1991), *aff'd*, 990 F.2d 7 (1st Cir. 1993)).

The issue here is whether Sunergy has alleged a distinct "enterprise" by coining "Greenworx Enterprise,"[18] Compl. ¶ 105, as apart from QKM. The Court finds that it has not. Sunergy asks the Court to treat the individual defendants and QKM as wholly separate, such that

---

*See id.*; *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 511 n.4 (S.D.N.Y. 1990). In briefing, Sunergy clarifies that 18 U.S.C. § 1962(c) is the "relevant" part of the statute and analyzes the elements accordingly. *See* Dkt. 26 at 6; *id.* at 9 (analyzing "conduct" element, as distinct to § 1962(c)); *id.* at 9–11 (analyzing "enterprise" element, as distinct to § 1962(c)). However, in supplemental briefing, submitted after oral argument, Sunergy references § 1962(a). Dkt. 37 at 2. This citation is particularly confusing because it introduces a section concerning what racketeering acts are alleged in the Complaint, *id.*, but the definition of "racketeering activity" is consistent among RICO's subsections, *see* 18 U.S.C. § 1961. For purposes of this motion, the Court construes the Complaint as asserting a claim under 18 U.S.C. § 1962(c), consistent with Sunergy's own characterization, Dkt. 26 at 6.

[18] Defendants point out that QKM does business as Greenworx, Compl. ¶ 58, and is registered to do business in that name in at least Maine, *id.* ¶ 6. Of course, this is not legally dispositive as to their RICO synonymy. Nevertheless, the asserted fact is striking and apt.

the association among the three of them provides the necessary, overarching enterprise.  Dkt. 26 at 10.  This ignores the fact that Allen and Underriner are specifically alleged to be agents of QKM.  *See* Compl. ¶ 5 (identifying Allen as QKM's "Sole Officer and Director"); *id.* ¶ 44 (alleging that Underriner is an employee of QKM).  A corporation can act only through its employees, officers, subsidiaries, and agents.  *See Cedric*, 533 U.S. at 165–66.  Accordingly, Sunergy's enterprise allegation essentially amounts to that QKM, acting through Allen and Underriner, formed an enterprise (other than QKM) with Allen and Underriner.  This fiction is insufficient to satisfy RICO's requirement for distinct entities.

Sunergy relies heavily on *Cedric*, 533 U.S. 158 (cited in Dkt. 26 at 10), as requiring the opposite result.  However, that case dealt with a different issue—RICO liability against an individual, a corporate owner-employee.  *Id.* at 160–61, 164–65.  In *Cedric*, the individual's corporation *was* the enterprise, not subject to liability, and the court merely held that the individual's employee-owner status did not preclude his being a "person," "employed by" that corporation-enterprise, subject individually to liability under the statute.  *Id.* at 163–64.  Indeed, the *Cedric* Court specifically distinguished and cast doubt upon the applicability of its reasoning to a construction like Sunergy's, that "a corporation [is] the 'person' and the corporation, together with all its employees and agents, [are] the 'enterprise.'"  *Id.* at 164.  Following *Cedric*, courts have repeatedly recognized that distinction and "reaffirmed that allegations that a corporation is the 'person' and a corporation and its employees are the 'enterprise' . . . do not satisfy the distinctness requirement."  *Liberty Mut. Ins. Co. v. Aftermath Servs. LLC*, 2023 WL 5435878, at *3 n.3 (D. Mass. Aug. 23, 2023) (citing four circuit courts that have addressed the issue).

The Court adopts this consensus, particularly in light of the Supreme Court's guidance that the enterprise cannot just be one of the liable persons "referred to by a different name."  *Cedric*,

533 U.S. at 161. To illustrate, one can talk of the nine justices of the Supreme Court as individual entities. Likewise, one can talk of the Supreme Court as an entity. However, it becomes silly to talk about the nine justices acting in concert with the Supreme Court (comprised of themselves) as some type of overarching, super-metaphysical "enterprise." The more fictive reading urged by Sunergy would defeat the statute's apparent purpose in separating liable "persons" from "enterprises." *See* 18 U.S.C. § 1962(c).

Sunergy has not identified a RICO "enterprise," apart from QKM. Liability under 18 U.S.C. § 1962(c) attaches only to persons, not enterprises. *Cedric*, 533 U.S. at 161. Therefore, the motion to dismiss the racketeering claim against QKM is ALLOWED.

### 2.    Predicate Racketeering Acts

Defendants are likewise correct that a racketeering claim under RICO must allege predicate racketeering acts as set out within and limited by 18 U.S.C. § 1961(1). Dkt. 19 at 16–17. Here, however, Defendants read the Complaint too narrowly. Sunergy does not track its allegations to any of the statute's specifically enumerated offenses. *See* Compl. ¶¶ 104–13 (alleging "unlawful acts"). However, this is not fatal to its claim. Sunergy is required only to "state ***facts*** sufficient to ***portray*** [] specific instances of racketeering activity." *See Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) (emphases added). It is not required to "pin [its] claim for relief to a precise legal theory," *Skinner*, 562 U.S. at 530, of what underlying criminal violations are constituted. Accordingly, the Court undertakes the task of "review[ing] the complaint for likely candidates." *See Molina v. Union Independiente Autentica De La AAA*, 555 F. Supp. 2d 284, 296 (D.P.R. 2008).

To that end, Sunergy's own suggestions are unavailing. *See* Dkt. 26 at 14–15 (citing 18 U.S.C. §§ 1951 ("Interference with commerce by threats or violence"), 1952 ("Interstate and foreign travel or transportation in aid of racketeering enterprises"), and 1341 (mail fraud)). Sunergy alleges no actual, attempted, or conspired-for "force, violence, or fear" necessary to

constitute "robbery or extortion." *Cf.* 18 U.S.C. § 1951(a)–(b).  Likewise, the "unlawful activity" implicated by 18 U.S.C. § 1952 does not encompass all illicit acts, as Sunergy suggests, Dkt. 26 at 14–15, but rather only a specific subset, not relevant to this case, involving gambling, contraband liquor, controlled substances, prostitution, extortion, bribery, arson, and money laundering. 18 U.S.C. § 1952(b).  Finally, Sunergy does not allege that the Defendants ever even used the mail, let alone perpetrated fraud by means of it.[19]  *Cf.* 18 U.S.C. § 1341.

Nevertheless, the Court adds two additional candidates which better fit the bill:  wire fraud, 18 U.S.C. § 1343, and theft of trade secrets, 18 U.S.C. § 1832.  *See* 18 U.S.C. § 1961(1).  Sunergy's allegations are sufficient for each.  The allegations demonstrating wire fraud moreover satisfy Rule 9(b)'s heightened pleading standard.

### a.    Wire Fraud

For purposes of the wire fraud statute, the "unauthorized dissemination or other use" of "confidential information" can "deprive the owner of its property rights," such that a dishonest scheme to deprive constitutes fraud.  *United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir. 1997).  Here, Sunergy alleges that Underriner, acting through the QKM (formerly "Greenworx") enterprise, used the internet, Compl. ¶ 28, to download Sunergy's confidential business leads without its authorization by pretending to be a current Sunergy employee, *id.* ¶¶ 33–34, 41–43, thus depriving Sunergy of the value of those leads, *id.* ¶¶ 58–60.  These facts clearly satisfy the basic elements for wire fraud.  *See Czubinski*, 106 F.3d 1069, 1075 (stating that unauthorized access to confidential information can constitute wire fraud, assuming the requisite intent).

---

[19] In supplemental briefing, Sunergy also attempts to make use of state-law statutes covering fraud or larceny. Dkt. 37 at 2–3.  But violations of state law can only constitute predicate RICO acts where those acts or threats "involv[e] murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical."  18 U.S.C. § 1961(1)(A).

Sounding in fraud, such allegations must satisfy Rule 9(b)'s heightened pleading standard. *Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud." A party satisfies Rule 9(b) by "plead[ing] or alleg[ing] the date, time, and place of the alleged fraud or otherwise inject[ing] precision or some measure of substantiation into a fraud allegation." *Ferring Pharms. Inc. v. Braintree Lab'ys, Inc.*, 38 F. Supp. 3d 169, 181 (D. Mass. 2014) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). The adequacy of pleadings under Rule 9(b) is necessarily "case- and context-specific." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017). The First Circuit has advised courts to "keep in mind" the purpose of the rule: "to place the defendants on notice and enable them to prepare meaningful responses," "to preclude the use of a groundless fraud claim as a pretext to discovering a wrong," and "to safeguard defendants from frivolous charges which might damage their reputations." *New Eng. Data Servs., Inc. v. Becher*, 829 F.2d 286, 289, 292 (1st Cir. 1987).

Under these circumstances, Sunergy's level of detail is sufficient. Sunergy clearly states the content of the misrepresentations—Underriner allegedly pretended to be someone he is not (a Sunergy employee identified as "JL") by entering that person's username and password. Compl. ¶¶ 43, 48–49. Sunergy further alleges that this behavior occurred "on an almost daily basis throughout July and August 2024." *Id.* ¶ 47. *Cf. Howard v. Cycare Sys., Inc.*, 128 F.R.D. 159, 163 (D. Mass. 1989) (declining to dismiss claims based on misrepresentations alleged to have occurred within a three-month span). Finally, Sunergy lays out from where the information was allegedly downloaded and to where it went. Compl. ¶¶ 31–34. *Cf. Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 50 (1st Cir. 2020) (satisfying the "where" part of the inquiry by alleging the movements of fraudulent transfers). While Sunergy has certainly not included every possible

"scrap of detail" imaginable, *id.*, the nature of the allegations and the level of detail provided satisfy Rule 9(b)'s purpose in preventing Defendants from having to defend against non-specific, "groundless" claims and "frivolous charges." *Id.* at 51.

> ### b.    Theft of Trade Secrets

Even if Sunergy's allegations were insufficient for wire fraud, theft of trade secrets, under 18 U.S.C. § 1832, would otherwise suffice for a predicate act.  That statute "criminalizes the knowing theft of trade secrets." *United States v. Martin*, 228 F.3d 1, 11 (1st Cir. 2000).  Under the statute, trade secrets are defined "broadly[] to include both tangible property and intangible information, as long as the owner 'has taken reasonable measures to keep such information secret' and the information 'derives independent economic value . . . from not being generally known to . . . the public.'" *Id.* (quoting 18 U.S.C. § 1839(3)).  In passing the statute, Congress "mean[t] to punish 'the disgruntled former employee who walks out of his former company with'" that company's valuable trade secrets. *Id.* (quoting *United States v. Hsu*, 155 F.3d 189, 201 (3d Cir. 1998) (citing H.R. Rep. No. 104–788, at 7)).

Sunergy's allegations would qualify its business leads as trade secrets.  They constitute "intangible information," *Martin*, 228 F.3d at 11, which derive value from their being unknown and inaccessible to competitors such as QKM, Compl. ¶¶ 29, 58–60.  Moreover, Sunergy alleges that its leads were protected by passwords to traceable accounts, *id.* ¶¶ 28–29, 48–49, and, to some degree at least, by contract, *id.* ¶ 46.  *Cf. G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96, 107 (D. Mass. 2023) (finding trade secret plaintiff reasonably likely to succeed where trade secrets were protected by password but not by contract).  Combined with its conversion allegations, *see, e.g.*, Compl. ¶¶ 33–37, Sunergy has clearly alleged the existence of trade secrets and theft thereof.

3.    **Pattern**

Now with an understanding of what racketeering acts Sunergy has alleged, the Court can determine whether Sunergy has pled a "pattern" of such acts.  The Court finds that it has.  The RICO statute itself expressly requires at least two racketeering acts within a ten-year period. 18 U.S.C. § 1961(5).  The Supreme Court has further elaborated on this requirement, holding that "the racketeering predicates [must be] related" and must "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  In *H.J.*, the Supreme Court identified two theories by which a plaintiff might establish "continued criminal activity," as either "closed-ended" or "open-ended."  *Giuliano v. Fulton*, 399 F.3d 381, 387 (1st Cir. 2005) (discussing *H.J.*, 492 U.S. at 242).  Under the "closed-ended" approach, continuity is established through an actual showing of continuous acts, taking place over a "substantial period of time."  *Id.*  By contrast, an "open-ended" approach "projects into the future," *H.J.*, 492 U.S. at 241, by asking whether predicate acts, occurring over a shorter time period, "threatened the likelihood of[] continued criminal activity."  *Id.* at 237.

Here, Sunergy has pled substantially more than two acts in ten years.  Each alleged use of the wires to deprive Sunergy of its leads' value constitutes a separate indictable act.  *See United States v. Fermin Castillo*, 829 F.2d 1194, 1199 (1st Cir. 1987); *United States v. Gordon*, 875 F.3d 26, 36 (1st Cir. 2017).  Theft of trade secrets further adds to the list.[20]

---

[20] In the technical context, theft of trade secrets is often treated as a single act, even where the trade secrets are numerous and stolen in multiple installments.  *See, e.g.*, *Sylabs, Inc. v. Rose*, 2024 WL 2059716, at *7 (N.D. Cal. May 8, 2024); *see also Hardwire, LLC v. Ebaugh*, 2021 WL 3809078, at *7 (D. Md. Aug. 26, 2021) (explaining that only "theft" of trade secrets, rather than the broader category of "misappropriation," encompassing use and disclosure, is included among RICO's predicate acts).  *But see Skye Orthobiologics, LLC, et al. v. CTM Biomedical, LLC, et al.*, 2021 WL 6104163, at *4 (C.D. Cal. Aug. 30, 2021) (relying on ongoing use of trade secrets to establish pattern of racketeering); p. 22, *infra* (distinguishing cases concerning technical trade secrets).

These acts, moreover, "threatened the likelihood of[] continued criminal activity." *See H.J.*, 492 U.S. at 237.[21]    Defendants argue that any threat must have concluded by September 7, 2024, because, by that date, the whole of Sunergy's leads had already been stolen. Dkt. 19 at 18 (citing Compl. ¶ 33); Dkt. 31 at 3–4.  This is akin to saying that a bank cannot be robbed again once all its money has been stolen—the bank can get more money and then be robbed again.  The instant case is distinct, for example, from *Gen. Elec. Co. v. Iljin Corp.*, 1993 WL 41752 (D. Mass. Feb. 12, 1993), wherein the defendants were accused of stealing trade secrets describing a process for manufacturing synthetic diamonds.  *Id.* at *5.  There, the court likened the defendants to a "one time bank robber," whose various post-robbery activities to move and make use of his loot fail to establish a pattern of bank robbery (*i.e.*, a threat that the robber is likely to do it again). *Id.*  By extension to this case, Defendants' alleged *uses* (even their ongoing use) of Sunergy's business leads do not necessarily establish that Defendants are likely to steal again.  However, unlike in *Iljin* and other technical trade secret cases, the business leads here are not just parts of a single valuable thing that might be stolen with completion (*e.g.*, plans for new technology).  Rather, the at-issue business leads are a replenishable resource—Defendants might keep coming back for more, and the allegations are that they did, Compl. ¶ 47.  Thus, the situation here is more akin to that of a *many*-time bank robber, whose repeated break-ins establish a pattern of such thefts, and where the lack of a finite purpose belies the notion of the robberies' finality.

To the extent Defendants' argument is that external circumstances have changed, such to make future thefts impossible or unlikely, the Court rejects the underlying premise that such a

---

[21] In its opposition, Sunergy expressly adopts the "open-ended" approach.  Dkt. 26 at 12–13.  This makes sense because, as Defendants point out, the acts alleged here did not occur over what would be deemed a "substantial period of time."  *See* Dkt. 19 at 17 (citing *Giuliano*, 399 F.3d at 387).

change would negate Sunergy's claim.[22]  While the First Circuit has not addressed this issue, other courts have held that "the threat of continuity must be viewed at the time the racketeering activity occurred."  *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).[23]  Accordingly, "[t]he lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity."  *Id.* at 238; *see also United States v. Cadden*, 2016 WL 3167066, at *3 n.7 (D. Mass. June 6, 2016) (quoting *Busacca*).  The Court adopts this reasoning. To hold otherwise would create a perverse incentive for potential RICO plaintiffs, for example, to leave corrupt employees at their posts to preserve RICO claims based on the threat they present. *Cf. Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 (9th Cir. 1995).

Sunergy has successfully pled a "pattern" of activity for its racketeering claim.

## V.    **Conclusion**

For the reasons stated above, Defendants' motion to dismiss the racketeering claim for failure to state a claim is ALLOWED as to QKM.  Defendants' motion is otherwise DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated:  March 25, 2025                           Judge, United States District Court

---

[22] In its opposition, Sunergy explains that the thefts stopped once it fixed its security breach by changing its passwords.  Dkt. 26 at 14; Dkt. 26-1 ¶¶ 8–9.  On a Rule 12(b)(6) motion, the Court cannot and does not consider facts presented outside the Complaint.  *Freeman v. Town of Hudson*, 714 F.3d 29, 35–36 (1st Cir. 2013).  Nevertheless, the allegation that Defendants were stealing "daily" from Sunergy throughout July and August, Compl. ¶ 47, supports the inference that, by early September, there was a clear threat of these thefts' continuing.  In the end, whether Defendants were cut off by Sunergy's changing its passwords, by a strategic decision from Sunergy to stop relying on leads as a source of new business, or just because leads were being converted faster than they could be added—the details of that external "interruption," *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991), do not change the analysis.

[23] This reasoning accords with basic jurisprudence—for instance, in assault, the "threat of the use of physical force" is judged when the frying pan is swung, not after it misses.  *See United States v. Franklin*, 560 F. Supp. 3d 398, 405 (D. Mass. 2021), *aff'd*, 51 F.4th 391 (1st Cir. 2022).